Joseph H. Lemkin (JL-2490)
**DUANE MORRIS LLP**
**A Delaware Limited Liability Partnership**
744 Broad Street, Suite 1200
Newark, New Jersey 07102
(973) 424-2000
Facsimile (973) 424-2001

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**08 CIV. 3372**

**JUDGE CONNER**

| | |
|---|---|
| BANC OF AMERICA PRACTICE SOLUTIONS, INC., as servicer for BANK OF AMERICA, successor by merger and acquisition to MBNA AMERICA (DELAWARE), N.A., assignee of Sky Bank, and as agent for U.S. Bank Trust National Association,<br><br>                    Plaintiff,<br><br>        v.<br><br>COLLEEN A. WATSON, DDS, PC, AND COLLEEN A. WATSON, DMD, Individually,<br><br>                    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Civil Action No.

**COMPLAINT**

Plaintiff, Banc of America Practice Solutions, Inc. (f/k/a MBNA Practice Solutions, Inc., f/k/a Sky Financial Solutions, Inc.) as servicer for Bank of America, N.A., successor by merger and acquisition to MBNA America (Delaware N.A.) assignee of Sky Bank and as agent for U.S. Bank Trust National Association ("BOA"), as and for its complaint against defendants Colleen A. Watson, DDS, PC, and Colleen A. Watson, DMD, individually (collectively, "Defendants"), alleges as follows:

1.      BOA is a corporation organized and existing under the laws of the State of Ohio, having an office for the transaction of business at 2740 Airport Drive, Suite 300, Columbus, Ohio 43219. BOA is authorized to conduct business in the State of New York.

DM3\700163.1

2.      Upon information and belief, defendant Colleen A. Watson, DDS, PC ("Borrower") is a professional corporation, with its principal place of business at 107 Bannon Avenue, Buchanan, New York, 10511.

3.      Upon information and belief, defendant Colleen A. Watson, DDS, ("Guarantor") is an individual presently residing at 5-6 Steven Drive, Ossining, New York 10562. Guarantor is the principal of the Borrower.

## JURISDICTION

4.      The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

## VENUE

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 (c).

## FIRST CAUSE OF ACTION
### (Breach of Contract)

6.      Plaintiff repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

7.      On or about December 21, 2004, for good and valuable consideration, Borrower entered into a Finance Agreement (the "Finance Agreement") with BOA's predecessor Sky Bank, whereby Sky Bank provided a loan (loan # 1841915-9001) in the original principal amount of $990,000 to the Borrower in order to provide initial financing for the Borrower's dental practice located at 107 Bannon Avenue, Buchanan, New York 10511.  A true and correct copy of the Finance Agreement is annexed hereto as **Exhibit A**.

8.      Pursuant to the terms of the Finance Agreement, Borrower agreed to make certain monthly payments to BOA as more particularly described therein.

2

9.      Borrower has defaulted under the terms of the Finance Agreement by, *inter alia*, failing to make monthly payments due to BOA since remitting the January, 2008 monthly payment, as well as by failing to cure late fees and other charges accruing due under the Finance Agreement.  Borrower's February and March 2008 obligatons under the Finance Agreements are presently due and owing and, to date, remain unpaid.

10.     On or about March 19, 2008, BOA sent letters to the Defendants regarding options to resolve the Borrower's default under the Finance Agreement.  A follow up letter was subsequently sent by counsel for BOA.  Copies of the letters evidencing Borrower's default are annexed hereto collectively as **Exhibit B**.

11.     Despite the letters referenced in paragraph 10, and several prior attempts by BOA to have Defendants cure the arrears under the Finance Agreement, the Defendants have refused and continue to refuse to pay for the arrearages noted above in violation of the Finance Agreement and all accompanying documents.

12.     As of March 19, 2008, there is due and owing by the Borrower to BOA the default balance (which includes, *inter alia*, late charges and past due amounts) of $943,752.59, plus attorneys' fees, costs and any other charges under the Finance Agreement, all of which continue to accrue.

13.     BOA has and hereby declares all sums due and to become due for the full term of the Finance Agreement immediately due and payable.


## SECOND CAUSE OF ACTION
### (Replevin)

14.     BOA repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

DM3\700163.1

15.    In order to secure payment of Borrower's and Guarantor's obligations under the Finance Agreement and related loan documents (collectively, the "Loan Documents"), BOA obtained a first priority lien and security interest, which encumbers all of the assets of the dental practice operated by the Borrower, including but not limited to assets, equipment, inventory, accounts, general intangibles, chattel paper, machinery and fixtures and the proceeds of all of the foregoing (the "Collateral").  BOA's predecessor perfected its security interest in the Collateral by filing a UCC-1 Financing Statement with the New York Secretary of State.  A copy of the UCC-1 Financing Statement that refers to the Collateral is annexed hereto as **Exhibit C**.

16.    Pursuant to the Loan Documents, upon default by the Borrower or Guarantor, BOA is entitled to immediate possession of the Collateral.

17.    As set forth above, Borrower and Guarantor have defaulted under the Loan Documents by failing to make payment to BOA when due.

18.    The Collateral has been intentionally and wrongfully converted and detained by Borrower and Guarantor and is situated at the premises located at 107 Bannon Avenue, Buchanan, New York 10511.

19.    The fair market value of the Collateral is approximately $440,000.[1]

20.    Accordingly, BOA is now entitled to immediate possession of the Collateral.

---

[1]    This value is based upon a complete recovery of the dental practice in place, including good will.  The actual liquidation value of the Collateral would be substantially lower than this amount.  In addition, this value is based upon financial information from the year 2007 and may change based upon the practice's 2008 financial figures.

21.    Upon information and belief, the Collateral has not been taken for a tax, assessment, or fine pursuant to law, nor has it been taken under an execution or attachment against the property of the Plaintiff.

22.    Plaintiff hereby demands turnover of the Collateral.

### THIRD CAUSE OF ACTION
### (Breach of Guarantee)

23.    BOA repeats, realleges and reiterates each of the foregoing paragraphs as though fully set forth herein.

24.    Guarantor personally, solely and unconditionally guaranteed all of the indebtedness arising directly or contingently from the Loan Documents, including all indebtedness of Borrower.  Guarantor's guarantee is annexed to **Exhibit A**.

25.    As of March 19, 2008, there was due and owing and payable by Guarantor, individually to BOA, as a guarantor pursuant to the Loan Documents, the total sum of $943,752.59.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

26.    BOA repeats, reiterates and realleges each of the forgoing paragraphs as though fully set forth herein.

27.    The Borrower received the above described loan proceeds and other valuable consideration as set forth in the Loan Documents and have full use of the proceeds of the loans without making payment therefore as required under the Loan Documents.

28.    Borrower has been unjustly enriched in an amount equal to $943,752.59, the total outstanding payments due and owing to BOA.

29.    Accordingly, Borrower is liable to BOA in the amount of $943,752.59, due to such unjust enrichment.

5

DM3\700163.1

## FIFTH CAUSE OF ACTION
### (Attorneys' Fees and Costs as against Borrower and Guarantor)

30.    BOA repeats, reiterates and realleges each of the forgoing paragraphs as though fully set forth herein.

31.    The Loan Documents provide that Borrower and Guarantor are liable for all legal fees and costs incurred by BOA as a result of Borrower's and Guarantor's default.

32.    By reason of Borrower's and Guarantor's defaults under the Loan Documents and their failure to cure the same, BOA retained attorneys to pursue collection of this matter.

33.    Accordingly, BOA is entitled to an award of its attorneys' fees and costs incurred and to be incurred in the prosecution of this action.

**WHEREFORE**, BOA hereby demands judgment as follows:

A.    On the First Cause of Action:

    1.    Awarding a money judgment against Borrower, in the amount of $943,752.59, with interest thereon from March 19, 2008, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

B.    On the Second Cause of Action:

    1.    For an Order giving BOA possession of the Collateral, plus damages for its wrongful detention; and in the event the Collateral cannot be delivered to BOA, that BOA have judgment against Defendants for the value thereof, plus damages for its wrongful detention.

C.    On the Third of Action:

    1.    Awarding a money judgment against Guarantor, in the amount of $943,752.59, with interest thereon from March 19, 2008, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

D.    On the Fourth Cause of Action:

    1.    Awarding a money judgment against Borrower in the amount of $943,752.59, with interest thereon from March 19, 2008, until the date of which all amounts due thereunder have been paid, plus late charges and attorneys fees.

E.     On the Fifth Cause of Action:

     1.     Awarding a money judgment against the Defendants, each in an
amount to be determined, for BOA's fees and costs incurred in the
prosecution of this action.

F.     Any additional and further relief as may be deemed just and appropriate.

Respectfully submitted,

**DUANE MORRIS LLP**

By: _____
      Joseph H. Lemkin (JL-2490)
      744 Broad Street
      Newark, N.J. 07102
      Telephone (973) 424-2000
      Facsimile (973) 424-2001

Attorneys for Banc of America Practice
Solutions, Inc.

Dated:  April 2, 2008

7



# Finance Agreement

| Box 1 |
|---|
| BORROWER: (Legal Name):  Colleen A Watson, DDS, PC |

| Box 2 | |
|---|---|
| ADDRESS:   107 Bannon Avenue | BUSINESS PHONE: (914)737-2869 |

| CITY: Buchanan | STATE: NY | ZIP: 10511 | COUNTY: |
|---|---|---|---|

| Box 3 | Box 3 (con't) |
|---|---|
| TYPE OF ORGANIZATION:  Corporation | STATE OF ORGANIZATION: NY |

| Box 4 PRINCIPAL AMOUNT | Box 5 INTEREST RATE | Box 6 TERM | Box 7 MONTHLY PAYMENT | Box 8 ADVANCE PAYMENT |
|---|---|---|---|---|
| $990,000.00 | 8.66% | 120 (Months) | 120 payments of $12359.46 | |

ADDITIONAL PROVISIONS:

**DISCLAIMER:** No supplier, broker or salesperson is an agent of Lender or its assignee with respect to the Indebtedness, as defined herein, nor are they authorized to waive or alter the terms of this Agreement.  Their representations shall in no way affect Borrower's or Lender's rights and obligations as herein set forth.  Borrower acknowledges that Borrower independently selected and determined the suitability of the Indebtedness for Borrower's intended use, without being advised by Lender.  Borrower has no (and hereby waives, discharges and releases all, and agrees not to assert any) defenses affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against Lender, directly or indirectly, arising out of, based upon, or in any manner connected with, loans by Lender to Borrower, the practice and related assets being purchased and/or financed by Borrower with the proceeds of such loans, or any related transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or begun prior to the execution hereof.

**This Finance Agreement** (this "Agreement") is a promissory note, security agreement and personal guaranty, all of which are to be construed together and are binding upon the parties hereto. **Borrower and any Guarantor have read and accepted all terms of this Agreement prior to signing it.  This Agreement is being executed for business purposes and not for personal family, household or agricultural purposes.**  Time is of the essence in Borrower's and Guarantor's performance of their obligations hereunder and under all related instruments and documents executed and/or delivered pursuant hereto and any renewals or extensions thereof.

**DEFINITIONS:** As used in this Agreement, the capitalized terms set forth below shall have the following meanings:  (a) *"Acceptance Date"* means the date set forth in box 11; (b) *"Borrower"* means the individual or entity whose name appears in

1

Please initial

box 1, its successors and assigns; (c) *"Collateral"* means all of the business personal property of Borrower wherever located, and whether now owned or hereafter acquired, including without limitation: (i) Accounts, including health-care insurance receivables; (ii) Chattel Paper; (iii) Inventory; (iv) Equipment and Fixtures; (v) Instruments; (vi) Investment Property; (vii) Documents; (viii) Deposit Accounts; (ix) General Intangibles, including patient lists, records and files; (x) Supporting Obligations; and (xi) to the extent not listed above as original Collateral, proceeds and products of the foregoing, including but not limited to, payments from insurance claims for the loss, damage or destruction of any of the Collateral. Any term used in the UCC and not defined in this Agreement has the meaning given to the term in the UCC, as the same may be amended from time to time; (d) *"Default Rate"* means the lesser of (i) 5 percentage points per annum above the interest rate set forth in box 5 above; or (ii) the maximum rate of interest permitted by applicable state law; (e) *"Governmental Authorities"* means, collectively, any federal, state or local government, and other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any department, agency or instrumentality thereof; (f) *"Guarantor"* means, collectively, jointly and severally, the individual or individuals whose names appear in box 10, or on any other guaranty agreement related to this Agreement; (g) *"Indebtedness"* means the Principal Amount plus all interest, fees and expenses due or to become due Lender pursuant to the terms hereof and also any and all other indebtedness, obligations and liabilities of Borrower to Lender or any affiliate of Lender, whether now existing or hereafter arising, absolute or contingent, due or to become due, liquidated or unliquidated, direct or indirect, including all interest, fees and expenses incurred in connection therewith; any of the foregoing that arises after the filing of a petition by or against Borrower under the United States Bankruptcy Code, even if the indebtedness, liabilities and obligations are not allowed claims under the United States Bankruptcy Code; (h) *"Lender"* means Sky Bank, an Ohio banking corporation, by and through its agent and administrator, Sky Financial Solutions, Inc., an MBNA company, and their successors and assigns; (i) *"Loan Documents"* means this Agreement, any and all promissory notes and any and all other documents, instruments, guaranties, certificates, agreements, loan agreements, security agreements, guaranties, deeds of trust, mortgages, assignments or other contract with or for the benefit of the Lender, or securing or evidencing payment of any Indebtedness of the Borrower, previously, simultaneously or hereafter executed and/or delivered by the Borrower, any guarantor and/or any other Person in connection with the Principal Amount or any of the other Indebtedness, all as the same may be amended, modified, restated, substituted, extended and renewed at any time and from time to time; (j) *"Monthly Payment"* means the amount set forth in box 7 above; (k) *"Payment Date"* means the day of the month scheduled by Lender for the Monthly Payment; (l) *"Practice"* means Borrower's professional practice; (m) *"Principal Amount"* means the amount set forth in box 4 above; (n) *"Security"* means all guaranties of any Indebtedness, all interests of Lender in the Collateral and all other agreements, rights, or interests insuring or guaranteeing payment of any Indebtedness or giving the Indebtedness priority over the repayment or performance of other obligations of Borrower; (o) *"Term"* means the period from the Acceptance Date until the final Payment Date for the last Monthly Payment of the Term; and (p) *"UCC"* means the Uniform Commercial Code, as adopted by and codified into the laws of the state of Ohio, as the same may be amended from time to time.

**PROMISSORY NOTE:** 1. **Loan.** Subject to the terms and conditions set forth herein, Lender shall loan to Borrower the Principal Amount. Borrower, for value received, promises to pay the Indebtedness to the order of Lender in accordance with the terms of this Agreement.

2. **Conditions Precedent to Loan.** The obligation of Lender to advance the Principal Amount is subject to all of the conditions and requirements of this Agreement and delivery of the following required documents or other action, all of which are conditions precedent: (a) if Borrower is a corporation, a certified resolution of Borrower's Board of Directors duly authorizing the execution, delivery and performance of all of the documents required hereunder, or, if Borrower is a partnership or a limited liability company, resolutions of Borrower's partners, members or managers, as applicable, duly authorizing the execution, delivery and performance of all of the documents required hereunder, (b) UCC financing statements duly executed on Borrower's behalf, if required, (c) the execution and delivery of such other instruments, documents, opinions, reports, agreements or guaranties as Lender may deem necessary or appropriate to consummate or implement the transactions contemplated hereby; (d) completion or fulfillment of any conditions listed in the Additional Provisions text box above; (e) Borrower shall have taken such other action as Lender may reasonably require to perfect its security interest in the Collateral and shall have paid all costs and expenses incident thereto; and (f) completion and fulfillment by Borrower of all terms, provisions, and conditions of the Credit Conditions and Funding Requirements issued by Lender to Borrower.

3. **Interest.** Interest shall accrue on the unpaid Principal Amount for each day from the Acceptance Date at the per annum fixed rate of interest set forth in box 5 above until paid in full. Notwithstanding the foregoing, the Default Rate shall be applied and shall accrue on any Indebtedness not paid when due and on any judgment obtained by Lender against Borrower or any Guarantor pursuant to this Agreement. Interest shall be computed on the basis of a month of 30 days and a year of 360 days, and shall be payable monthly in arrears on the Payment Date.

4. **Scheduled Payments.** The outstanding Principal Balance, plus all unpaid accrued interest, fees and other charges permitted in this Agreement, shall be due and payable in full on the Maturity Date. Until the Maturity Date, Borrower shall make Monthly Payments to Lender on or before each Payment Date during the Term. The Monthly Payments due and payable by Borrower to Lender shall be applied first, to unpaid accrued interest, second, to the outstanding principal amount, (in such order as the Lender may elect), and third, to any outstanding fees, charges, and expenses permitted under this Agreement. Any payments received in advance of the Acceptance Date will be applied (in the order as Lender may elect) to the last Monthly Payments due under this Agreement. Borrower shall make all scheduled payments to Lender at such address as Lender may designate in writing from time to time.

Lender can accept late or partial payments, as well as payments marked "paid in full" or with other restrictive endorsements, without losing any of its rights under this Agreement. Any payment of a smaller sum than due, and/or any partial payment intended as a payment in full of a disputed amount under the Indebtedness, regardless of any endorsement restriction, will not constitute an accord and satisfaction, and must be sent to: Sky Financial Solutions, Inc., 2740 Airport Drive, Suite 300, Columbus, Ohio 43219-2286, Attention: Customer Service Manager. Any communication with Lender concerning Borrower's dispute of any amounts due under the Indebtedness, as well as any payments of less than the full amount due and payable hereunder, must be sent to the address set forth in the preceding sentence. All other payments the Borrower makes towards the Indebtedness are to be mailed to the address the Lender sets forth on the Borrower's monthly billing statement.

2

Please initial

5. **Payment Adjustments.** Borrower hereby authorizes Lender to adjust the Monthly Payment proportionately upward or downward if the Principal Amount changes after the Acceptance Date. Lender shall notify Borrower in writing of any such adjustment.

6. **Waiver of Presentment, etc.** Borrower and all endorsers, guarantors, and other parties who may now or in the future be primarily or secondarily liable for payment of the Indebtedness evidenced hereby, waive presentment for payment, demand, notice of nonpayment, notice of dishonor, protest, notice of protest and all other notices in connection with the delivery, acceptance, performance, default or enforcement of this Agreement or any payment made pursuant to its terms.

7. **Unconditional Obligation.** Each Borrower and each Guarantor agree that its obligation to make payments to Lender hereunder is absolute and unconditional, under all circumstances whatsoever, and shall not be affected by any defect in the condition, design or operation of the Collateral, any lack of maintenance or service of any Collateral, or any setoff, counterclaim, defense or reduction which Borrower or Guarantor may have against Lender, or any supplier, servicer, broker, salesperson or other third party.

8. **Documentation and Administrative Costs and Fees.** Borrower shall pay or reimburse Lender its documentation and administrative costs and fees relating to the loan extended to Borrower under this Agreement, including but not limited to, document preparation costs, commitment fees, lien search and title fees, and filing fees for financing statements, as well as any attorneys' fees and costs incurred by Lender in renegotiating the provisions of this Agreement with Borrower.

**SECURITY AGREEMENT:** 1. **Security Interest.** Borrower grants Lender a security interest in the Collateral and the proceeds of the Collateral to secure payment and performance of the Indebtedness.

2. **Representations, Warranties and Covenants.** Borrower and any Guarantor, when applicable, represent, warrant, covenant and agree that at all times: (a) the Collateral shall be kept at the location specified in box 2 above, Borrower shall promptly notify Lender of any change in the location of the Collateral, and Borrower shall not remove the Collateral from said location without the prior written consent of Lender, except for Inventory sold in the ordinary course of business; (b) the chief executive office, principal place of business, or business domicile, and the state of organization of Borrower are as set forth in boxes 2 and 3 above, and Borrower shall not relocate its chief executive office, principal place of business or business domicile, or change its state of organization or name without providing Lender with 30 days' prior written notice; (c) except for the security interest granted hereby, and other interests in favor of Lender, and except as otherwise consented to in writing by Lender, Borrower is the owner of the Collateral, free from any lien, security interest, encumbrance, assignment, judgment, lien, claim or charge of any kind (whether perfected or unperfected, avoidable or unavoidable) or financing statement or other filing, with respect to any Collateral, and Borrower will defend the Collateral against all claims and demands of any and all persons at any time claiming the Collateral or any interest therein; (d) except for sales of Inventory in the ordinary course of business, Borrower will not sell, exchange, lease or otherwise dispose of any interest in the Collateral without the prior written consent of Lender and shall not, without the consent of Lender, permit any lien, security interest or encumbrance to attach to the Collateral; (e) Borrower authorizes Lender to file a financing statement describing the Collateral and, and/or, at Lender's option from time to time, all assets and/or all personal property of Borrower, and, if Lender has pre-filed a financing statement with respect thereto, Borrower hereby ratifies such filing. Borrower hereby waives any right that Borrower may have to file with the applicable filing officer any financing statement, amendment, termination or other record pertaining to the Collateral and/or Lender's interest therein. Borrower will cooperate with Lender in obtaining control of any Collateral in which a security interest may be perfected by possession or control and will, at Borrower's expense, make and do all such acts and things as Lender may from time to time request for the better evidencing, perfection, protection or validation of or realization of the benefits of, its security interest. At the request of Lender, Borrower shall join with Lender in executing one or more financing statements, or amendments thereto, for the Collateral pursuant to the requirements of the UCC, in form satisfactory to Lender. A carbon, photographic or other reproduction of this Agreement or a financing statement will be sufficient as a financing statement. Borrower hereby appoints Lender or its designee, with full power of substitution, as Borrower's attorney-in-fact to execute and/or file UCC financing statements and other security documents in Borrower's name and to perform all other acts that Lender deems necessary or appropriate to perfect and protect Lender's security interest in the Collateral. Such appointment is coupled with an interest with full power of substitution, and is irrevocable.

3. **Maintenance, Insurance, and Taxes.** Borrower shall maintain the Collateral in good condition, repair and working order. In the event of any loss, theft, damage or destruction of the Collateral, Borrower shall immediately notify Lender and, at the option of Lender shall: (a) place the same in good repair, condition and working order; (b) replace the same with like Collateral in good repair, condition and working order, free and clear of all encumbrances except in favor of Lender; or (c) pay Lender the remaining Indebtedness. Borrower shall, at Borrower's expense, maintain insurance on the Collateral against fire, theft, and such other hazards and in such form and amount as Lender may require. The amount of such insurance shall be not less than the greater of (a) the fair market value of the Collateral, or (b) the aggregate amount of outstanding Indebtedness. Lender shall be named, in a manner satisfactory to Lender, as an additional insured and/or as loss payee on all policies of insurance required hereunder. The proceeds of such insurance shall be applied, at Lender's sole election, toward the replacement or repair of the Collateral or to reduce Borrower's then outstanding Indebtedness. Borrower hereby appoints Lender as Borrower's attorney-in-fact to make any claim for, receive payment of, or execute or endorse all documents, checks or drafts for loss or damage or return of premium under such insurance. Each insurance policy shall provide that the insurance policy cannot be cancelled without 30 days' prior written notice to Lender. Borrower agrees to furnish to Lender proof of each insurance policy insuring the Collateral by providing to Lender a copy of the certificate of insurance or the policy itself within 10 days following the date hereof. Lender shall have the right, but not the obligation, to purchase insurance on the Collateral in such amounts, from such insurers and for such premiums, as Lender may deem appropriate. Borrower agrees to promptly reimburse Lender for all costs incurred in connection with obtaining such insurance plus an administrative fee of $25.00 each month until Borrower provides evidence of such insurance satisfactory to Lender. Payment of such fee does not relieve Borrower from its obligation to obtain insurance. Borrower shall pay and discharge when due all taxes imposed on the Collateral. Further, Lender may discharge taxes, liens or other encumbrances at any time levied or placed on the Collateral and pay for the maintenance and preservation of the Collateral should Borrower fail to do so. Borrower agrees to promptly reimburse Lender on demand for any payment so made, and until such reimbursement, the amount so paid by Lender shall be added to the Indebtedness.

3

Please initial

**UNCONDITIONAL GUARANTY.**  1. **Guaranty.** Each Guarantor absolutely, unconditionally, jointly and severally guarantees the prompt payment when due of all Indebtedness. If Borrower fails to pay all or any part of any Indebtedness when due, Guarantor shall immediately pay to Lender the outstanding balance of all Indebtedness, regardless of whether or not Lender first pursues Borrower or exhausts any of its rights or remedies against Borrower or other Security. If Guarantor consists of more than one individual or entity, each Guarantor shall be jointly and severally liable to Lender with respect to all guaranteed obligations, including, without limitation, the Indebtedness.

2. **Inducement to Lender.** Each Guarantor (a) acknowledges that Lender would not have extended any credit, including credit evidenced by the Indebtedness, to Borrower but for the guaranty; (b) represents and warrants that Guarantor has given its guaranty to induce Lender to extend and to continue to extend credit to Borrower hereunder; (c) agrees that Lender may rely on the guaranty in extending future credit to Borrower; (d) represents and warrants that each Guarantor has received good and valuable consideration for the guaranty; (e) waives acceptance of the guaranty; (f) represents and warrants that Guarantor has not given the guaranty in reliance upon the existence of any Security; (g) acknowledges receipt of notice of all Indebtedness existing before the date Guarantor signs this Agreement; (h) waives notice of any increases in the Indebtedness incurred after this date; and (i) waives protest and all other notices of failure to pay the Indebtedness or to perform any agreement relating to any Indebtedness or the Security.

3. **No Reliance.** Each Guarantor (a) warrants that he/she/it has not relied on any information about Borrower, the Security, or any other guarantor of the Indebtedness in providing its guaranty of the Indebtedness; (b) warrants that Guarantor has had ample opportunity to investigate Borrower, Borrower's affairs, the Security, and the effect that the Indebtedness will have on Borrower; and (c) agrees that Lender has _no_ obligation to provide Guarantor any information about Borrower or the Security.

4. **Lender's Actions.** Without notice to or the consent of any Guarantor, Lender may do or refrain from doing anything affecting any Indebtedness or any Security, including, without limitation, the following: (a) granting or not granting any indulgences to anyone liable for payment of any Indebtedness or any Security; (b) failing to obtain or to perfect any Security; (c) failing to obtain an enforceable agreement to repay any Indebtedness; (d) releasing any Security or anyone or any property from liability for payment of any Indebtedness; (e) changing any agreement relating to any Indebtedness or any Security; (f) extending the time for payment of any Indebtedness; and (g) delaying in enforcing or failing to enforce any rights to payment of any Indebtedness or rights against any Security. Each Guarantor hereby waives all suretyship and other similar defenses, including, without limitation, (a) notice of any default hereunder or under any of the other Loan Documents and notice of all indulgences; (b) notice of any increase in the amount of any portion of or all of the Indebtedness; (c) demand for observance, performance or enforcement of any of the terms or provisions of this Agreement, or any of the other Loan Documents; (d) all errors and omissions in connection with Lender's administration of the Indebtedness; (e) any right or claim of right to cause a marshalling of the assets of Borrower; and (f) any act or omission of Lender which changes the scope of Guarantor's risk hereunder.

5. **Subordination; Subrogation.** If Guarantor shall advance any sums to Borrower or if Borrower shall hereafter become indebted to Guarantor, such sums and indebtedness shall be subordinate in payment in all respects to the Indebtedness then or thereafter due and owing to Lender under the Loan Documents until all of the Indebtedness have been indefeasibly paid in full. Nothing herein contained shall be construed to give Guarantor any right of subrogation in and to this Agreement or the other Loan Documents or all or any part of Lender's interest therein, until the Indebtedness shall have been indefeasibly paid in full.

6. **Reinstatement.** If at any time any payment, or portion thereof, made by, or for the account of, Borrower or Guarantor on account of any of the Indebtedness hereunder or under any of the Loan Documents is set aside by any court or trustee having jurisdiction as a voidable preference or fraudulent conveyance or must otherwise be restored or returned by Lender to Borrower or to Guarantor under any insolvency, bankruptcy or other federal and/or state laws or as a result of any dissolution, liquidation or reorganization of Borrower or upon, or as a result of, the appointment of any receiver, intervenor or conservator of, or trustee, or similar officer for Borrower, or any substantial part of its properties or assets, Guarantor hereby agrees that the Indebtedness hereunder shall continue and remain if full force and effect or be reinstated, as the case may be, all as though such payments(s) had not been made.

7. **Continuing Guaranty.** This is a continuing guaranty and may not be terminated or revoked by Guarantor unless and until all Indebtedness to Lender has been indefeasibly paid in full in cash and Lender has no commitment to provide credit to Borrower.

**GENERAL PROVISIONS.** 1. **Application.** The following General Provisions apply to this entire Agreement including the promissory note, security agreement and guaranties.

2. **Powers and Authority.** Each Borrower and Guarantor represents and warrants that he/she/it has the power and authority to incur the obligations hereunder and to execute, deliver and perform this Agreement, and certifies that each of their signatures hereto is genuine. The execution and delivery by Borrower and Guarantor of this Agreement will not contravene or violate any law or any contract to which Borrower or Guarantor is a party.

3. **Information to be Furnished.** Upon the request of Lender, Borrower and each Guarantor (when applicable) agree to furnish, or cause to be furnished, to Lender (a) annual financial statements in a form required by Lender setting forth the financial conditions and results of operation of Borrower and Guarantor; (b) copies of Borrower's and Guarantor's federal income tax returns; (c) annual financial statements of each Guarantor hereunder in the form required by Lender; and (d) such other financial information as Lender may from time to time reasonably request. Borrower and Guarantor represent and warrant to Lender that the financial statements and other financial information provided to Lender are true, complete and correct, present fairly the financial position of Borrower and Guarantor as of their respective dates, that no material adverse change has occurred to the financial position of Borrower and Guarantor since the furnishing of such information, and that Lender has relied on said financial statements and financial information in making the loan under this Agreement to Borrower.

4. **Default Costs; Attorney Fees; Savings Clause.** Borrower agrees to pay to the order of Lender the following fees when incurred: (a) if any Indebtedness or portion thereof is not paid when due, Borrower agrees to pay Lender a late charge to compensate Lender for collecting and processing the late sum, such late charge being stipulated and liquidated at the greater of $.15 per dollar of such late sum or $15.00, plus an interest charge of 1.25% per month for every month, or part thereof, after the first month in which the sum is late, (b) a returned check charge equal to the greater of $50.00 or the actual bank

4

Please initial

charges to Lender at the time the check is returned for any reason, including without limitation, insufficient or uncollected funds, (c) a collection call charge of $20.00 per call to compensate Lender for the time and expense of making any such call, (d) a personal visit charge of up to $750.00 to compensate Lender for the time and expense in making such visit, (e) other amounts allowed by applicable law, including without limitation, costs of foreclosure and of obtaining a judgment for money damages, (f) fees and costs of attorneys employed by Lender for any purpose related to this Agreement or the Indebtedness, including consultation, drafting documents, sending notices or instituting, prosecuting or defending any proceedings. Such proceedings include any arbitration, collection, bankruptcy, civil action, mediation, and counterclaim in which Lender prevails or post judgment action or appeal with respect to any of the foregoing. The fees and charges payable to Lender under this Section are in addition to such other interest, fees and charges that Lender may assess against Borrower pursuant to other provisions of this Agreement. Notwithstanding any provision in this Agreement to the contrary, the aggregate amount of all interest, fees, penalties, expenses and other charges payable by Borrower to Lender hereunder (collectively, "Costs") shall not exceed the maximum amount permitted under applicable law, and/or, to the extent included in the determination of interest, the maximum interest rate allowable under applicable law ("Maximum Rate"). If the aggregate amount of all Costs would otherwise exceed the Maximum Rate, such amounts shall be reduced, in a manner selected by Lender in its sole and absolute discretion, to equal in the aggregate the maximum amount permitted under applicable law. No party bound by this Agreement or any other of the Loan Documents shall have an action or remedy against Lender for any damages whatsoever or any defense to the enforcement of this Agreement any of the other Loan Documents given in connection herewith arising out of the payment or collection of any interest in excess of the Maximum Rate.

5.  **Events of Default.** The following shall be events of default hereunder ("Events of Default"): (a) failure to make any payment of the Indebtedness, and except for a failure to pay at maturity, such failure continues for 10 days after it first becomes due; (b) Borrower or any Guarantor defaults in the performance of any of their obligations or breaches any representation, covenant, or warranty under this Agreement, under any of the other Loan Documents, or any other agreement with Lender or any affiliate of Lender; (c) the loss, theft, destruction, sale, assignment or unpermitted encumbrance of or on any Collateral; (d) attachment, execution or levy on any Collateral; (e) dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of Borrower or any Guarantor, assignment for the benefit of creditors by or the commencement of any proceedings under any bankruptcy or insolvency laws by or against Borrower or any Guarantor; (f) Borrower or any Guarantor dies, stops doing business as a going concern, merges, consolidates, transfers all or substantially all of its assets to a third party or undergoes a substantial deterioration of financial condition; (g) an amendment or termination relating to a filed financing statement describing any of the Collateral is improperly filed by Borrower or Guarantor; or (h) Lender deems itself insecure for any other reason or determines that there has been a material adverse change in the business, prospects, condition, affairs or operations of Borrower or any Guarantor; or (i) Lender receives notification or is otherwise made aware that Borrower or Guarantor is listed as or appears on any lists of known or suspected terrorists or terrorist organizations provided to Lender by the U.S. government under the USA Patriot Act of 2001.

**Federal law requires us to provide the following information: We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**

6.  **Remedies on Default. (A) Lender's Rights and Remedies.** Upon the occurrence of an Event of Default, Lender may at its option, exercise one or more of the following remedies without notice or demand, except as required by law: (i) cease making additional advances under this Agreement; (ii) declare all indebtedness immediately due and payable; (iii) charge interest at the Default Rate on all Indebtedness; (iv) exercise all of Lender's rights and remedies as a secured party, including the right to enter any premises where the Collateral may be located without legal process and take possession of and remove the Collateral which, upon request of Lender, Borrower agrees to assemble and to make available at a place designated by Lender; (v) sell, lease or otherwise dispose of any Collateral at public or private sale and collect any deficiency balance with or without resorting to legal process; (vi) require Borrower to assign and transfer custody of its patient medical and/or dental files, records, charts and/or lists to a duly licensed medical, dental or other health care practitioner selected by Lender in its sole discretion, and Borrower agrees to execute such documents as Lender deems necessary to effect such assignment and transfer; or (vii) exercise any other right or remedy available to Lender at law or in equity, including without limitation, the right of set-off. Lender has no obligation to clean up or otherwise prepare the Collateral for sale. Lender has no obligation to attempt to satisfy the Indebtedness by collection from any other person liable therefor, and Lender may release, modify or waive any Security without affecting Lender's rights against Borrower or Guarantor, each of whom waive any right he/she/it may have to require Lender to pursue any third person for any of the Indebtedness. Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and compliance will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral. Lender may sell the Collateral without giving any warranties with respect thereto and may specifically disclaim any warranties of title or the like. This procedure will not be construed to adversely affect the commercial reasonableness of any sale of the Collateral. If Lender sells any of the Collateral on credit, Borrower will be credited only with payments actually made by the purchaser, received by Lender and applied to the Indebtedness of the purchaser. If the purchaser fails to pay for the Collateral, Lender may resell the Collateral, and the Indebtedness shall be credited with the proceeds of the sale. If Lender purchases any of the Collateral, Lender may pay for the Collateral by crediting some or all of the Indebtedness. Lender shall have no obligation to marshal any assets in favor of Borrower or against Borrower or in payment of this Agreement, any of the other Indebtedness or any other obligation owed to Lender by Borrower or any other person.

(B)  **Protected Health Information.** (i) For purposes of this Section 6(B), (a) "Business Associate" shall have the same meaning as the term "business associate" in 45 CFR § 160.103; (b) "Data Aggregation" shall have the same meaning as the term "data aggregation" in 45 CFR § 164.501; (c) "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191; (d) "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g); (e) "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health

5

Please initial

Information at 45 CFR Part 160 and Part 164, Subparts A and E; (f) "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR § 160.103, limited to the information created or received by Lender from or on behalf of Borrower; (g) "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR § 164.103; (h) "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee; and (i) "Security Rule" shall mean the Security Standards at 45 CFR Part 160 and Part 164, Subparts A and C. Any other terms used in this Section 6(B), but not otherwise defined in this Agreement, shall have the same meaning as those in the Privacy Rule and/or the Security Rule. A reference in this Section to a section of the Privacy Rule or the Security Rule means the section as amended from time to time. (ii) If Borrower is subject to the Privacy Rule, the terms and conditions of this Section 6(B) apply. If Borrower is not subject to the Privacy Rule, then Lender, in its sole and absolute discretion, determines whether the terms and conditions of this Section 6(B) apply. (iii) The terms and conditions of this Section 6(B) apply only to Protected Health Information that is outside the scope of the banking exception found in Section 1179 of the Social Security Act. (iv) The parties agree that Lender may receive Protected Health Information as a result of the Lender exercising its rights and/or remedies under this Agreement. Lender may use or disclose the Protected Health Information in the manner described or permitted in this Agreement; provided that such use or disclosure would not violate the Privacy Rule if done by Borrower, or as otherwise permitted under HIPAA. Lender may also use and disclose Protected Health Information for the proper management and administration of Lender or to carry out the legal responsibilities of the Lender, provided that, with respect to any disclosure, the disclosure is Required By Law or Lender obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and will be used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person agrees to notify the Lender of any instances of which it is aware in which the confidentiality of the information has been breached. Lender may use Protected Health Information to provide Data Aggregation services to Borrower as permitted by 42 CFR § 164.504(e)(2)(i)(B). Lender may disclose Protected Health Information to Borrower's other Business Associates and may use and disclose Protected Health Information received from Borrower's other Business Associates. (v) In the event that Lender does receive Protected Health Information, Lender: (a) agrees not to use or further disclose Protected Health Information other than as permitted or required in this Agreement or as Required By Law; (b) agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for in this Agreement; (c) agrees to report to Borrower any use or disclosure of the Protected Health Information not provided for by this Agreement of which it becomes aware; (d) agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Lender on behalf of, the Borrower agrees to the same or similar restrictions and conditions that apply to the Lender in this Section 6(B); (e) agrees to provide access, at the request of the Borrower, to the Protected Health Information in a manner that complies with the requirements under 45 CFR § 164.524; (f) agrees to make any amendment(s) to Protected Health Information as required by 45 CFR § 164.526; (g) Lender agrees to provide to Borrower the information required to permit Borrower to timely respond to a request by an Individual for an accounting of any disclosure of Protected Health Information by Lender, as required by 45 CFR § 164.528; and (h) agrees to make internal practices, books, and records relating to the use and disclosure of Protected Health Information received from, or created or received by Lender on behalf of, Borrower available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Borrower's compliance with the Privacy Rule. (vi) To the extent that the following may affect Lender's use or disclosure of Protected Health Information, Borrower shall: (a) notify Lender of any limitation(s) in its notice of privacy practices; (b) notify Lender of any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information; (c) notify Lender of any restriction that Borrower has agreed to in accordance with 45 CFR § 164.522(a) prior to the first date written above and shall obtain Lender's prior written approval of any such restriction requested after such date that Borrower wishes to accept; and (d) notify Lender of any restriction that Borrower has agreed to in accordance with 45 CFR § 164.522(b). (vii) Lender reserves the right to provide Borrower with an addendum to Borrower's notice of privacy practices describing only Lender's use and disclosure of Protected Health Information. If provided to Borrower, Borrower shall incorporate the addendum into its notice of privacy practices and shall provide it as required under 45 CFR § 164.520. (viii) In accordance with 45 CFR § 164.314, effective as of the compliance date of the Security Rule for covered health care providers, Lender agrees to: (a) implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Borrower; (b) ensure that any agent, including a subcontractor, to whom it provides such electronic PHI agrees to implement reasonable and appropriate safeguards to protect it; and (c) report to Borrower any security incident of which it becomes aware. (ix) Borrower and Lender agree that termination of this Section is infeasible. Therefore, upon Borrower's knowledge of a material breach by Lender of this Section 6(B), Borrower shall notify Lender in writing of the material breach and provide an opportunity for Lender to cure the breach or end the violation. If the material breach is not cured or ended within a reasonable period of receipt of written notice thereof, Borrower may report the violation to the Secretary. For purposes of this subsection (ix), sixty (60) days is

6

Please initial

deemed to be a reasonable period under all but extraordinary circumstances. (x) If Lender determines it is not feasible for Lender to return or destroy all Protected Health Information when this Agreement terminates, the protections of this Section 6(B) to such Protected Health Information shall be extended and Lender agrees that further uses and disclosures of such Protected Health Information shall be limited to those purposes specified in this Section 6(B) which survive termination of the Agreement or for those purposes that make the return or destruction infeasible, for so long as Lender maintains such Protected Health Information. (xi) The Parties agree to take such action as is necessary to amend this Section 6(B) from time to time as is necessary: (a) for Borrower and/or Lender to comply with the requirements of HIPAA, including but not limited to the Privacy Rule and the Security Rule; and (b) to provide Lender with the greatest possible access to Protected Health Information in order for Lender to exercise all of its rights and/or remedies under this Agreement. (xii) This Section 6(B) is between the parties hereto. Nothing express or implied in this Section 6(B) is intended to confer, nor shall anything herein confer, any rights, remedies, obligations, or liabilities whatsoever upon any person other than Borrower and Lender and their respective successors and assigns. (xiii) The respective rights and obligations of Borrower and Lender under this Section 6(B) shall survive the termination of this Agreement.

**Notice to and Consent by Florida Borrowers and Guarantors: Garnishment: Borrower and any Guarantor consent to the issuance of a continuing writ of garnishment or attachment against Borrower's and/or any Guarantor's disposable earnings in accordance with Section 222.11, Florida Statutes in order to satisfy in whole or in part, any money judgment entered in favor of Lender.**

7. **Waivers.** No delay or omission by Lender in exercising any right or remedy hereunder shall impair any right or remedy, waive or operate as an acquiescence to the Event of Default or affect any subsequent default of the same or a different nature.

8. **Choice of Law, Jurisdiction; Venue.** This Agreement and all matters arising out of, resulting from or in any way connected with this Agreement, the Indebtedness, the Collateral, the Security and the relationship between Borrower, Guarantor and Lender shall be governed by, interpreted under and construed in accordance with the internal laws of the State of Ohio. Borrower and Guarantor shall select and consent to be subject to the personal jurisdiction of any state or federal court selected by Lender or its assignee and located in the State of Ohio or in any other state in which Lender or its assignee conducts business, so that trial shall be by and only to the court selected by Lender or its assignee.

9. **JURY WAIVER. BORROWER, GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG THE BORROWER, GUARANTOR AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY RELATIONSHIP BETWEEN BORROWER, GUARANTOR AND LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER'S EXTENDING THE INDEBTEDNESS AND OTHER FINANCIAL ACCOMMODATIONS TO BORROWER HEREUNDER.**

10. **Consent to Service of Process.** Borrower and Guarantor agree that, in addition to other process permitted by applicable law, any process served for any action or proceeding hereunder shall be valid if mailed by certified mail, return receipt requested, with delivery restricted to either the addressee, its registered agent or any agent appointed in writing to accept such process.

11. **Lender's Liability; Indemnity.** Lender shall not be liable to Borrower or any Guarantor for any indirect, consequential, punitive, or special damages of any kind or nature arising in connection with this Agreement, the Collateral, the Indebtedness or the Security. Borrower hereby agrees to indemnify, defend and hold Lender, its parent and affiliates, and its and their officers, directors, employees and agents harmless from and against all loss, liability and expense, including reasonable attorney's fees and expenses, of whatever kind and nature, imposed on, incurred by or asserted against Lender that in any way relate to or arise out of this Agreement, the consummation of the transactions contemplated hereby or the Collateral, including but not limited to (a) the selection, manufacture, purchase, acceptance or rejection of any item of Collateral or the ownership of the Collateral; (b) the delivery, lease, possession, maintenance, use, condition, return or operation of the Collateral; (c) payment of property, use, franchise or other taxes imposed on the Collateral when payment of said taxes is demanded or requested from Lender by any taxing authority; (d) any patent or copyright infringement; (e) the conduct of Borrower, its officers, employees and agents; and (f) a breach by Borrower of any of its covenants or obligations hereunder. This provision shall survive expiration or termination of this Agreement.

12. **Financial Statements; Credit Reports.** Borrower and each Guarantor represent and warrant to Lender that any financial information and other statements provided by Borrower and any Guarantor to Lender by credit application or otherwise are true, complete and correct, present fairly the financial position of Borrower and Guarantor as of their respective dates, and no material adverse change has occurred in the financial condition of Borrower or Guarantor since the furnishing of such information. Borrower and each Guarantor are currently meeting all of their debts as they come due. Borrower and each Guarantor authorize Lender to obtain, at Borrower and Guarantor's cost, and exchange with its affiliates and with non-Lender affiliates, credit reports or information contained therein, including consumer credit reports, in connection with this Agreement, and for periodic reviews, updates, renewals, extensions and collections.

13. **Binding Effect; Assignment; Execution.** This Agreement is binding upon and shall inure to the benefit of Borrower, Guarantor and Lender and each of their respective successors, heirs, personal representatives and permitted assigns, if any. Lender may rely upon an electronically authorized signature or consent by Internet or a facsimile signature telecopied to Lender by or on behalf of Borrower or any Guarantor as an authentic signature evidencing a binding and enforceable agreement. Borrower and Guarantor may not assign this Agreement. Lender may assign its rights and obligations under this Agreement at any time without the consent of Borrower or Guarantor. Borrower and each Guarantor agree that the rights of

7

Please initial

Lender's assignee will not be subject to claims, defenses or setoffs that Borrower or any Guarantor may have against Lender. Borrower and each Guarantor will pay Lender's assignee hereunder regardless of any claims, defenses or setoffs that Borrower or any Guarantor may have against Lender. Borrower and each Guarantor agrees that Lender is not an agent of Lender's assignee and that Lender has no affiliation with such assignee except for such assignment.

14. **Disclaimer of Warranties.** Lender makes no warranty or representation, either express or implied, as to the value, design, condition, merchantability or fitness for a particular purpose or fitness for use of the Collateral or any other warranty or representation, express or implied, with respect thereto. In no event shall Lender be liable for any loss or damage in connection with or arising out of this Agreement, the Collateral or the existence, furnishing, functioning or Borrower's use of any item or products or services provided for in this Agreement.

15. **Additional Affirmative Covenants.** So long as there is any indebtedness, liabilities or obligations (whether now existing or hereafter arising under the Indebtedness, this Agreement, the Loan Documents or otherwise) of Borrower to Lender, Borrower will: (a) respond promptly (but in no event later than the second business day after) and completely to Lender's telephone and written inquiries regarding the status of the Practice and the financial condition of Borrower; (b) (i) do or cause to be done all things necessary to obtain, enter into, preserve and keep in full force and effect all material licenses and all material agreements relating to third party payor or reimbursement programs or plans, (ii) engage in the Practice on a full-time basis; and (iii) observe the requirements (including, without limitation, requirements with respect to drugs, medications, medical waste, and "controlled substances") of all Governmental Authorities and agents of Governmental Authorities and perform the terms of all material agreements relating thereto; and (c) notify Lender immediately of any (i) notice, claim or demand from any Governmental Authorities which alleges that Borrower or any professional in the Practice is in violation of any of the terms of, or has failed to comply with, any requirement of law regulating the Practice or its operations; (ii) actual, threatened or pending (A) revocation suspension, probation, restriction, limitation, forfeiture or refusal to renew of any license, or (B) decertification, revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew any participation or eligibility in Medicare or Medicaid and any third party payor program to the extent decertification, revocation, suspension, probation, restriction, limitation, forfeiture or refusal to renew any such other third party payor program could materially adversely affect the ability of Borrower to repay the Indebtedness; and (iii) other developments in the business or affairs of Borrower which could adversely affect the ability of Borrower to repay the Indebtedness or comply with the provisions of this Agreement or any of the Loan Documents.

16. **Additional Negative Covenants.** So long as there is any indebtedness, liabilities or obligations (whether now existing or hereafter arising under the Indebtedness, this Agreement, the Loan Documents or otherwise) of Borrower to Lender, Borrower will not allow or suffer: (a) any breach, rating reduction, restriction, suspension, probation, failure to renew, cancellation, rescission, termination, lapse or forfeiture of any material license for Borrower or for any professional now or hereafter employed by or practicing with Borrower or of any material third party payor participation or reimbursement agreements now or at any time hereafter existing for the benefit of Borrower or the Practice related to rights to payment or reimbursement from, and claims against, private insurers, managed care plans, employee assistance programs, Blue Cross and/or Blue Shield, federal, state or local Governmental Authorities, including without limitation, Medicare, Medicaid, and other third party payors; (b) the dismissal, resignation or other withdrawal from the Practice of any professional included in the Practice; or (c) the suspension of the Practice for more than thirty (30) days.

17. **Financial Covenants.** For every fiscal year of Borrower after the fiscal year in which this Agreement is dated, Borrower will not permit (determined as the last day of the fiscal year): (a) the ratio of (i) Borrower's cash basis net income plus depreciation and amortization plus interest expense for that fiscal year to (ii) Borrower's interest expense plus principal payments on long-term debt and capital leases, taxes and dividends due during that fiscal year, to be less than 1.0 to 1.0; or (b) the ratio of (i) Borrower's all outstanding liabilities for borrowed money, other interest bearing liabilities and capital leases on the last day of that fiscal year to (ii) Borrower's cash basis net income plus depreciation and amortization plus interest expense during that fiscal year, to be more than 3.0 to 1.0.

18. **Professional Insurance.** So long as there is any indebtedness, liabilities or obligations (whether now existing or hereafter arising under the Indebtedness, this Agreement, the Loan Documents or otherwise) of Borrower to Lender and without implying any limitation on this Agreement or any of the other Loan Documents, and if requested or required by Lender, Borrower shall maintain and keep in full force and effect the following insurances issued by one or more recognized, financially sound and responsible insurance companies approved by the Lender and qualified or authorized by applicable laws to assume the risks covered by such policy: (a) Malpractice Insurance with limits of not less than $2,000,000 for any one occurrence with a maximum $15,000 deductible; (b) General Liability Insurance with limits of $2,000,000 aggregate and $1,000,000 per occurrence with a maximum $500.00 deductible; (c) Key-Man Life Insurance in the amount equal to or exceeding the Principal Amount and shall assign benefits to the Lender as required by this Agreement as security for the Indebtedness; (d) Disability Insurance shall be provided in full force and effect equal to the Term of this Agreement in an amount equal to twelve (12) months of Monthly Payments and which shall be assigned in such form as Lender requires as security for the Indebtedness; (e) Property Insurance indicating full replacement value, inclusive of business income/interruption with a maximum of $500.00 deductible; (f) Excess Liability Insurance with limits of not less than $5,000,000 for any one occurrence, and (g) Workers' compensation insurance for all employees of Borrower in such amount as is required by applicable law. All insurance shall at all times be the subject of such certificates endorsements, assignments, evidences and other requirements as Lender may direct from time to time.

19. **Debt Covenant.** For so long as this Agreement is in effect, Borrower and Guarantor shall not directly or indirectly create, incur, assume or suffer to exist any indebtedness or liability for borrowed money, or for any other indebtedness or liability evidenced by notes, bonds, debentures, guaranties, or similar obligations other than: (a) the Indebtedness existing as of the date of this Agreement; (b) contingent liabilities arising out of the endorsement of items in the ordinary course of collection, and current short-term claims and payables incurred in the ordinary course of Borrower's business; and (c) leases for the rent of space to conduct Borrower's business.

20. **Condition Subsequent.** Borrower agrees and covenants with Lender that it will, subsequent to the closing of Borrower's loan hereunder and disbursements of loan proceeds under this Agreement, complete and fulfill any uncompleted and unfulfilled provisions or conditions contained in the Credit Conditions and Funding Requirements issued by Lender to Borrower, within any period prescribed by Lender.

Please initial

**21. Inspection.** Borrower shall permit any authorized representatives designated by Lender, at Lender's expense, so long as Borrower is indebted to Lender or this Agreement is in effect, to visit and inspect any of the properties of Borrower, and its subsidiaries, affiliates or divisions, the Collateral therein situated, and the books of account of Borrower, and to make copies and take extracts therefrom; and to discuss Borrower's affairs, finances and accounts with Borrower, and its officers, agents and accountants, all at such reasonable times and as often as requested.

**22. Construction.** The parties have participated jointly in the negotiation and drafting of this Agreement, and, in the event of any ambiguity or question of intent or interpretation, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**23. Execution by Internet or Facsimile.** This Agreement, and documents executed in connection with it and during its Term, may be executed by Borrower and Guarantor and delivered to Lender by Internet electronic signature or consent authorization, or by facsimile transmission. Borrower and Guarantor each represent and warrant that either the electronically authorized Internet signature or consent, or facsimile signature, is the true and authentic signature of Borrower and Guarantor. Lender may rely upon an electronically-authorized signature or consent by Internet, or facsimile signature telecopied to Lender, by or on behalf of Borrower or Guarantor as an authentic signature evidencing a binding and enforceable agreement. Borrower and Guarantor waive any claim or defense that his/her/its Internet electronic signature or consent authorization, or facsimile signature, is not authorized, authentic or enforceable in any proceeding to enforce this Agreement.

**24. Independent Review and Advice.** Borrower and Guarantor are advised to seek independent legal, tax and financial counsel regarding this Agreement. In the event that they decline to seek such counsel, it is intended to be a waiver thereof; and that such waiver has been freely given. Borrower and each Guarantor each warrant and represent to Lender that they have each received a complete copy of this Agreement and have read same and in so doing have obtained legal counsel or had the opportunity to consult with legal counsel in this regard. Borrower and Guarantor each acknowledge that no one else made any promise, representation or warranty whatsoever, express or implied, concerning this Agreement and further acknowledge that they have not executed this Agreement in reliance of any such promise, representation or warranty.

**25. Joint and Several Liability.** The liability of Borrower and each Guarantor hereunder is joint and several, and, upon an Event of Default hereunder, Lender may proceed with action, judicial or otherwise, to collect the Indebtedness due from Borrower and/or each Guarantor individually or jointly. Borrower and each Guarantor specifically agree, consent and authorize Lender to settle the whole or any part of the Indebtedness with either Borrower or any Guarantor, or all of them, without the express consent or authorization of any of them, and that Lender may proceed to collect any remaining Indebtedness after any said settlement from any party remaining liable hereunder. Lender may pursue, at its election, any nonjudicial or judicial proceedings to liquidate any Security or Collateral to satisfy the Indebtedness, and such election shall not preclude Lender from pursuing either Borrower or Guarantor for any remaining Indebtedness, or from pursuing the liquidation of any other Security or Collateral, in satisfaction of the Indebtedness.

**26. No Novation.** The parties hereto expressly agree that any existing Indebtedness of Borrower to Lender, which may be refinanced by this Agreement, shall not constitute a novation and that all rights, powers, liens, titles and estates created by virtue of past obligations, and the security interests therein given by Borrower or Guarantor to Lender, are hereby acknowledged as valid and existing liens against the property therein described.

**27. No Third Party Beneficiaries.** The parties intend that the benefits of this Agreement shall inure only to Borrower, Guarantor and Lender except as expressly so stated herein. Notwithstanding anything contained herein, or any conduct or course of conduct by any party hereto, before or after signing this Agreement, this Agreement shall not be construed as creating any right, claim or cause of action against Borrower, Guarantor or Lender by any other person or entity, other than Lender's assignee or holder by assignment of the Agreement.

**28. No Waivers; Cumulative Remedies.** No delay on the part of the Lender or of the owner or holder of this Agreement in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights and remedies set forth in this Agreement are cumulative and not exclusive to any rights or remedies that Lender or any subsequent owner or holder of the Agreement would otherwise have.

**29. Notices.** Any notices required or permitted to be given hereunder by any party to the other shall be in writing and shall be deemed delivered upon personal delivery; twenty-four (24) hours following transmission by facsimile with confirmation; twenty-four (24) hours following deposit with a courier for overnight delivery; or seventy-two (72) hours following deposit in the U.S. Mail, registered or certified mail, postage prepaid, return-receipt requested, addressed to the parties at the following addresses or to such other addresses as the parties may specify in writing: If to Lender: Sky Financial Solutions, Inc., Customer Service, 2740 Airport Drive, Suite 300, Columbus, OH 43219-2286; If to Borrower, at the name and address specified by Borrower in boxes 1and 2; If to Guarantor, at the name and address specified for Guarantor in this Agreement and/or any separate contract of guaranty.

**30. Severability.** In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**31. Supersession and Merger; Counterparts.** This Agreement constitutes the entire agreement among the parties hereto, and supersedes all prior or contemporaneous agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. All representations and negotiations, oral or written, concerning the subject of this Agreement are fully merged into this Agreement. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any other party, or by anyone acting on behalf of any party, that are not embodied herein, and that no other agreement, statement, or promise, oral or otherwise, shall be valid or binding if it is not contained in this Agreement, or in any document or writing relating to this Agreement and signed by Lender. This Agreement may be executed simultaneously in in several counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**32. Headings.** The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

9

Please initial

33. **Prepayments and Partial Payments.** Borrower may not prepay the Indebtedness in whole or in part during the first twelve (12) months of this Agreement. Thereafter, Borrower may prepay the Indebtedness in whole only by paying Lender an amount equal to: (a) the then outstanding Principal Amount, plus accrued interest computed on a simple interest basis and any other sums due Lender at the time of prepayment, plus (b) a prepayment premium equal to three percent (3.00%) of the original Principal Amount, if prepayment occurs in year two (2) from the Acceptance Date, and two percent (2.00%) of the original Principal Amount, if prepayment occurs in year three (3) from the Acceptance Date, and one percent (1.00%) of the original Principal Amount if prepayment occurs in year four (4) or in any year thereafter, from the Acceptance Date. Borrower shall pay the prepayment premium due hereunder whether the prepayment is voluntary or involuntary.

**PLEASE INITIAL HERE TO CONFIRM YOU HAVE READ AND UNDERSTAND THIS PROVISION OF YOUR LOAN.** _____ (Initials)

**ASSET PURCHASE AUTHORIZATION & ACCEPTANCE**

Borrower agrees that as of the Acceptance Date: (a) Borrower has received and inspected any equipment purchased with the proceeds of the loan made under this Agreement, (b) such equipment is in good working order and complies with the purchase orders/contracts for said equipment, (c) Borrower irrevocably accepts the equipment for purposes of the loan "as-is, where-is, with all faults," and (d) Borrower unconditionally waives any right it may have to revoke its acceptance of the equipment.

| Authorized Signature of Borrower(s): | | |
|---|---|---|
| X _Colleen Watson DDS_ | Colleen Watson DDS | 12/21/04 |
| Signature    (Please sign in BLUE ink) | Print Name & Title | Date |
| X | | |
| Signature    (Please sign in BLUE ink) | Print Name & Title | Date |

**Box 10  GUARANTOR (S)**
**Signature of Guarantor(s):**

| | | |
|---|---|---|
| X _Colleen Watson DDS_ | Print Name/Title: Colleen Watson  Date: 12/21/04 | |
| Signature    (Please sign in BLUE ink) | Print Address: | |
| X _Peter Marino_ | Print Name/Title: Peter Marino  Date: 12/21/04 | |
| Signature    (Please sign in BLUE ink) | Print Address: | |
| X | Print Name/Title: _____ Date: _____ | |
| Signature    (Please sign in BLUE ink) | Print Address: | |

**Box 11**
This Agreement is not binding and effective until fulfillment of all conditions set forth in subsection 2 captioned "Conditions Precedent to Loan" under the Section captioned "PROMISSORY NOTE", final credit approval of Lender, and acceptance by Lender, its assignee or nominee at its Ohio office, by its signature below.

**ACCEPTANCE BY SKY BANK:**
Authorized Signature:

X _____ Agent    12-29-04
Sign Name and Title  Deborah Bailey    Date

Sky, Sky Bank and Sky Financial Solutions are registered trademarks of Sky Financial Group, Inc. and are used under license by MBNA. Sky Financial Solutions is not affiliated with Sky Financial Group, Inc. or Sky Bank. Sky Financial Group, Inc. is not responsible for this product or service of MBNA.

10

Please initial    

33. Prepayments and Partial Payments. Borrower may not prepay the Indebtedness in whole or in part during the first twelve (12) months of this Agreement. Thereafter, Borrower may prepay the Indebtedness in whole only by paying Lender an amount equal to: (a) the then outstanding Principal Amount, plus accrued interest computed on a simple interest basis and any other sums due Lender at the time of prepayment, plus (b) a prepayment premium equal to three percent (3.00%) of the original Principal Amount, if prepayment occurs in year two (2) from the Acceptance Date, and two percent (2.00%) of the original Principal Amount, if prepayment occurs in year three (3) from the Acceptance Date, and one percent (1.00%) of the original Principal Amount if prepayment occurs in year four (4) or in any year thereafter, from the Acceptance Date. Borrower shall pay the prepayment premium due hereunder whether the prepayment is voluntary or involuntary.

**PLEASE INITIAL _____ HERE TO CONFIRM YOU HAVE READ AND UNDERSTAND THIS PROVISION OF YOUR LOAN.** _(CW)_ (Initials)

**ASSET PURCHASE AUTHORIZATION & ACCEPTANCE**
Borrower agrees that as of the Acceptance Date: (a) Borrower has received and inspected any equipment purchased with the proceeds of the loan made under this Agreement, (b) such equipment is in good working order and complies with the purchase orders/contracts for said equipment, (c) Borrower irrevocably accepts the equipment for purposes of the loan "as-is, where-is, with all faults," and (d) Borrower unconditionally waives any right it may have to revoke its acceptance of the equipment.

| Authorized Signature of Borrower(s) | | |
|---|---|---|
| X _Colleen Watson DDS_ | Colleen Watson DDS | 12/21/04 |
| Signature    (Please sign in BLUE ink) | Print Name & Title | Date |
| X | | |
| Signature    (Please sign in BLUE ink) | Print Name & Title | Date |

**Box 10 GUARANTOR (S)**
Signature of Guarantor(s)

| | |
|---|---|
| X _Colleen Watson DDS_ | Print Name/Title: Colleen Watson   Date: 12/21/04 |
| Signature    (Please sign in BLUE ink) | Print Address: |
| X _Peter Marino_ | Print Name/Title: Peter Marino   Date: 12/21/04 |
| Signature    (Please sign in BLUE ink) | Print Address: |
| X | Print Name/Title: _____   Date: |
| Signature    (Please sign in BLUE ink) | Print Address: |

**Box 11**
This Agreement is not binding and effective until fulfillment of all conditions set forth in subsection 2 captioned "Conditions Precedent to Loan" under the Section captioned "PROMISSORY NOTE", final credit approval of Lender, and acceptance by Lender, its assignee or nominee at its Ohio office, by its signature below.

**ACCEPTANCE BY SKY BANK:**
Authorized Signature:

X _____ Agent   12-29-04
Sign Name and Title _Deborah Bradley_    Date

Sky, Sky Bank and Sky Financial Solutions are registered trademarks of Sky Financial Group, Inc. and are used under license to MBNA. Sky Financial Solutions is not affiliated with Sky Financial Group, Inc. or Sky Bank. Sky Financial Group, Inc. is not responsible for this product or service of MBNA.

10                                                    Please initial   _(CW)_

DEC-22-2004 02:15 PM                                    9147628565                  P.02

# ADDITIONAL PERSONAL GUARANTY ADDENDUM

To induce the Lessor/Lender to enter into an Agreement with Lessee/Borrower, the undersigned, jointly and severally with all other guarantors, unconditionally guarantees to Lessor/Lender the prompt payment when due of all of Lessee's/Borrower's obligations to Lessor/Lender under the Agreement. Lessor/Lender shall not be required to proceed against Lessee/Borrower or the equipment subject to the Agreement or enforce any other remedy before proceeding against the undersigned. The undersigned agrees to pay all attorney's fees and other expenses incurred by Lessor/Lender by reason of default by the Lessee/Borrower or the undersigned. The undersigned waives notice of acceptance hereof and of all other notices or demands of any kind to which the undersigned may be entitled. The undersigned consents to any extensions or modifications granted to Lessee/Borrower and the release and/or compromise of any obligations of Lessee/Borrower or any other obligators and guarantors without in any way releasing the undersigned from its obligations hereunder. This guaranty shall bind the heirs, administrators, representatives, successors and assigns of the undersigned, and may be enforced by or for the benefit of any assignee or successor of Lessor/Lender. This guaranty represents the final, complete and entire agreement between the parties. This guaranty cannot be amended, modified, waived or discharged except by written document signed by the parties. This Guaranty Agreement may be executed by the guarantor and delivered to Lender by facsimile transmission, and will be effective on the date received by facsimile by Lender. Guarantor represents and warrants that the facsimile signature is the true and authentic signature of Guarantor. Guarantor waives any claim or defense that his/her facsimile signature is not authorized, authentic or enforceable in any enforcement proceeding to enforce this Guaranty Agreement. The interpretation, construction and validity of this guaranty shall be governed by the laws of the State of Ohio, where Lessor/Lender has its principal place of business, and where the guaranty is accepted by Lessor/Lender. The undersigned consents to the jurisdiction of any Federal or State Court, located in Franklin County, Ohio, with respect to any legal action commenced hereunder. LESSOR/LENDER AND THE UNDERSIGNED EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY.

| LESSEE/BORROWER |
| --- |
| Name: Colleen A Watson, DDS, PC |
| Address: 107 Bennon Ave |
| Buchanan, NY 10511 |
| |
| Guarantor: Colleen A Watson |
| Signature: _Colleen A Watson_ |
| Date: 12-22-04 |

| Accepted By |
| --- |
| By: _[signature]_ |
| Date: 12-29-04 |
| LESSOR/LENDER |

This agreement changes and modifies the Lease/Finance Agreement between Sky Bank/Sky Financial Solutions, Inc. (Lessor/Lender) and Colleen A Watson, DDS, PC (Lessee/Borrower). The modification(s) to the Lease/Finance Agreement are specified below, and may include, but are not limited to, the principal amount, term, frequency, advance payment, base payment and/or asset location.

Your signature below confirms acceptance and acknowledgment of the following changes and modification(s) to the Lease/Finance Agreement:

## Modifications are made as follows:

| From: | | To: | |
|---|---|---|---|
| Interest Rate | 8.66% | Interest Rate | 9.39% |
| Term | # 120 (Months) | Term | # 180 (Months) |

Monthly Payment    From: 120 payments of $12,359.46

Monthly Payment    To: 12 payments of $7,746.75 followed by 168 payments of $10,611.40

Except as modified by this agreement, all other terms and conditions of said Lease/Finance Agreement including addenda and schedules will remain in force. This Change Notification and Acknowledgment may be executed by the Lessee/Borrower and delivered to Lessor/Lender by facsimile transmission, and will be effective on the date received by facsimile by Lessor/Lender. Lessee/Borrower represents and warrants that its facsimile signature is the true and authentic signature of Lessee/Borrower. Lessee/Borrower waives any claim or defense that its facsimile signature is not authorized, authentic, or enforceable in any enforcement proceeding to enforce this Change Notification and Acknowledgment.

**Lessor/Lendor:**

*Sky Bank*
Name

*[signature]*    12-29-04
Signature    Date

**Lessee/Borrower:**

Colleen A Watson, DDS, PC
Lessee / Borrower Name

*[signature] DDS*    12/2/04
Signature    Date

Sky, Sky Bank and Sky Financial Solutions are registered trademarks of Sky Financial Group, Inc. and are used under license to MBNA. Sky Financial Solutions is not affiliated with Sky Financial Group, Inc. or Sky Bank. Sky Financial Group, Inc. is not responsible for this product or service of MBNA.

B

**VIA FACSIMILE/VIA OVERNIGHT MAIL**

March 19, 2008

Carolyn Minter
Attorney at Law
79 Croton Avenue
Ossining, NY 10562

Re:    Colleen Watson, DDS, PC/Loan No.: 1841915-9001 ("Loan")

Dear Ms. Minter:

In response to your letter to me dated March 14, 2008, it appears that the lack of meaningful communication has caused a lapse in our ability to effectively bring this matter to a productive resolution. This often seems to be the case, and rather than pointing blame to any of the parties concerned, we are interested, with you and your client's agreement, to moving this matter forward under the spirit and intent of my original letter to you dated February 26, 2008.

Enclosed is an update of that letter that incorporates the changes you requested, except for our agreement that we not issue 1099's. Additionally, since receiving a recent payment from your client, that now makes her loan with us due for the February 20, 2008 payment, I have revised due dates for payments and balance due information accordingly.

Please review this agreement with your client, and if acceptable, please have her execute it and return the original of it to me. Please retain a fully signed copy for your records. If we do not have this agreement signed and returned by your client on or before 5:00 p.m. ET of March 28, 2008, then we will expect your client to remit to us the sum of $30,065.95 on or before 5:00 p.m. ET of the same date, March 28, 2008, which will bring the account current in payment and pay in full all unpaid late fees.

If you have any questions, please feel free to contact me.

Sincerely,


Joseph L. Heeter
Vice President & Assistant General Counsel
Ph:    (614) 428-2102
Fax:    (614) 418-7905

cc:    Chuck White
       Bryan Murphy

Enclosure

**VIA FACSIMILE/VIA OVERNIGHT MAIL**

March 19, 2008

Carolyn Minter
Attorney at Law
79 Croton Avenue
Ossining, NY 10562

Re:    <u>Colleen Watson, DDS, PC/Loan No.: 1841915-9001 ("Loan")</u>

Dear Ms. Minter:

This letter supersedes and replaces all other previous offers to compromise the above-referenced Loan, whether written or oral. It is our understanding that you represent Colleen Watson, DDS, PC, our borrower under the above-referenced Loan ("Dr. Watson"). As you probably know, this Loan is past due for the monthly payment due February 20, 2008 in the amount of $10,611.40. She will also be due tomorrow for her March 2008 monthly payment. Our loan officer, Bryan Murphy, has reviewed with Dr. Watson her financial situation, and in view of this situation, we are making the following proposal for a compromise and settlement of the indebtedness under the Loan.

The total unpaid balance of the Loan, as of the date of this letter, is $943,752.59, which is comprised of $920,706.25 in unpaid principal, $14,203.19 in unpaid accrued interest, and $8,843.15 in unpaid late fees. Interest continues to accrue on the Loan at the rate of $240.15 per day. Dr. Watson has personally guaranteed payment and performance of the obligations under the Loan.

We are offering to accept the sum of $520,000.00 in full and final payment and satisfaction of the Loan ("Compromise Amount"). This offer of compromise and settlement of the Loan is contingent upon the following conditions being satisfied or continuing:

1.    Dr. Watson will remit to us the monthly payment due February 20, 2008 for the amount of $10,611.40 payable to the order of: "Bank of America, N.A.", and received in our office at 2740 Airport Dr., Ste. 300, Columbus, OH 43219 no later than 9:00 a.m. ET on March 28, 2008; and

2.    Dr. Watson will utilize her reasonable best efforts, and in good faith, to sell her professional practice located 107 Bannon Ave., Buchanan, NY 10511 ("Professional Practice") or to obtain new financing from a new lending source, to pay the Compromise Amount within one hundred eighty (180) days from the date of March 31, 2008; and

3.    For the period commencing March 31, 2008 and ending October 1, 2008, Dr. Watson will remit the following payments due under Loan for the following months (unless the Compromise Amount is earlier paid before any of the payments set forth below, in which case the next succeeding payments following receipt by us of the Compromise Amount will not be due):

   a)   Payment due 2/20/08 for $10,611.40 to be paid on or before March 28, 2008; and
   b)   Payment due 3/20/2008 for $10,611.40 to be paid on or before April 21, 2008; and
   c)   Payment due 4/20/2008 for $10,611.40 to be paid on or before May 20, 2008; and
   d)   Payment due 5/20/2008 for $10,611.40 to be paid on or before June 20, 2008;

     e) Payment due 6/20/2008 for $10,611.40 to be paid on or before July 20, 2008;

     f) Payment due 7/20/2008 for $10,611.40 to be paid on or before August 20, 2008;

     g) Payment due 8/20/2008 for $10,611.40 to be paid on or before September 20, 2008

4.     All payments set forth above shall be made in immediately available U.S. funds payable to the order of: "Bank of America, N.A.", and remitted to our office at 2740 Airport Dr., Ste. 300, Columbus, OH 43219.

5.     If Dr. Watson fails to make any required payment under paragraphs numbered 1 or 3 above within ten (10) business days from each of their due dates, or if the Compromise Amount is not received by us on or before 5:00 p.m. ET of October 1, 2008, this agreement to compromise and settle the Loan, and any offer made in connection with it, whether oral or written, shall be deemed void, cancelled, rescinded, and terminated, and of no further force and effect.

6.     Upon receipt of the Compromise Amount by us, we will (i) release Dr. Watson, DDS, PC, and Dr. Watson, DDS, individually, and Peter Marino, individually from their liability under the Loan, now and forever more, (ii) consider the receipt of the Compromise Amount as an accord and satisfaction and complete and full settlement of the Loan, (iii) will terminate and cancel our security interest and UCC lien filing against the business assets of the Professional Practice; and (iv) if we hold a mortgage against the real property located at 5-6 Stevens Drive, Ossining, New York, we will terminate, release and cancel that mortgage.

Our agreement with Dr. Watson for the compromise and settlement of the Loan does not constitute a waiver of our rights and remedies under the Loan, all of which are specifically reserved. Additionally, this offer and agreement if accepted, does not constitute a course of dealing, or a promise, implied or expressed, to enter into any agreement like or similar to this agreement in the future.

Upon acceptance us of the Compromise Amount, each party hereto does fully, for themselves, their heirs, executors and assigns, release and forever discharges the other parties, and their respective directors and officers, successors and assigns, from any and all claims, demands, actions, causes of action, expenses, attorneys fees and costs whether known or unknown, whether anticipated or unanticipated, which they in any way have or might have by reason of any act or omission of the other or any of its employees or agents relating in any way to the Loan. Each party represents and warrants that it has not assigned or transferred, or caused to be assigned or transferred, to any person or any other entity, any claim, demand or cause of action or other matter which is the subject of the Loan.

The acceptance, execution and delivery by us and Dr. Watson of this letter agreement are made to settle and compromise the Loan for the consideration set forth herein. Neither this letter agreement, nor any of the terms hereof, shall constitute, nor shall they be construed to be, an admission of any liability or wrong doing on the part of any party hereto.

This letter agreement contains the entire agreement between the parties hereto with respect to the matters referred to herein, may not be modified except by written agreement executed by the parties and shall be binding on and inure to the benefit of the respective successors, assigns, heirs, executors, administrators, and estates of each of the parties. This letter agreement shall be governed by, and interpreted in accordance with, the laws of the State of New York.

Neither party shall be liable under this letter agreement for any consequential, indirect or special damages, or damages arising from lost or prospective profits, or anticipated sales, whether known or unknown to any party. Each party waives any claim for punitive damages arising from the other party's actions or omissions under this letter agreement.

No delay or omission on the part of the holder in exercising any right hereunder shall operate as a waiver of such right or of any other right under this letter agreement. If any provision of this letter agreement shall be declared illegal or unenforceable, such provision shall be deemed annulled to the same extent as though it never had appeared herein, but the remaining provisions shall not be affected thereby.

**WAIVER OF JURY TRIAL. EACH PARTY TO THIS LETTER AGREEMENT VOLUNTARILY, IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THEM ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS LETTER AGREEMENT, OR ANY OTHER AGREEMENT OR DOCUMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO. THE PARTIES HERETO ACKNOWLEDGE AND AGREE THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE PARTIES ENTERING INTO THIS LETTER AGREEMENT.**

If the offer set forth in this letter is acceptable to Dr. Watson, please have her indicate her acceptance to it by having her sign it in the space provided below and returning it to us. If you have any questions, please feel free to contact Bryan Murphy at 1-888-495-2495 or myself. Thank you.

Sincerely,


Joseph L. Heeter
Vice President & Assistant General Counsel
(614) 428-2102


Acknowledged and agreed: The undersigned acknowledges and agrees that they have each read, understand, agree and consent to the terms and conditions of this letter agreement as set forth above.

COLLEEN A. WATSON, DDS, PC

By:  _____      _____, 2008
       Colleen A. Watson, DDS, President      Date


_____      _____, 2008
Colleen Watson, DDS, individually      Date



cc:    Chuck White
      Bryan Murphy
      Steve Gresh

3

C

Feb. 01, 2008                                                                          Page 1

UCC Direct Services
UCC Search Report

The following represents a listing of the documentation you requested through a careful search of effective UCC filings recorded in the Office of the Secretary of State of New York licensed from the State or an independent third party and maintained in computerized form and available through our offices. Variations of the Name and Address of the search key may appear on this report as a result of the search findings and your individual request for that information.

Because we cannot independently verify the accuracy of the public information maintained by the responsible government agency or other sources of this data, we make no guaranties, representations, or warranties as to the accuracy or completeness of this report. We cannot and do not accept any liability for errors or omissions.

This report reflects records effective Jan. 08, 2008

State of New York UCC Debtor Name Search results performed on the following Search Key:
Name = COLL%WATS
Exp./Term. Liens = No

  1   200412296081607 Original filed on Dec. 29, 2004
      expires on Dec. 29, 2009

| | |
|---|---|
| Debtor | COLLEEN A. WATSON, DDS, P.C. |
| | 107 BANNON AVE |
| | BUCHANAN NY 10511 |
| | |
| SecPty | MBNA AMERICA (DELAWARE), N.A. |
| | C/O SKY FINANCIAL SOLUTIONS 2740 AIRPORT DR. SUITE 300 |
| | COLUMBUS OH 43219 |
| | |
| SecPty | SKY BANK |
| | 236 S. MAIN STREET |
| | FINDLAY OH 45839 |

[End of Report]



Filing Number-200412296081607

955809    2004 Dec 29 AM11:03

**UCC FINANCING STATEMENT ADDENDUM**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

